APPEALS OF ANTHONY SCHNEIDER AND RICHARD M. C. GLENN.

Docket Nos. 4519, 4520. Submitted October 24, 1925. Decided February 19, 1926.

1. Under the terms of the contracts herein, the stock of the American Cigar Co. was income to the taxpayers in the respective years in which the certificates therefor were delivered to the extent of its fair market value at the times of such deliveries.

2. Dividends which, by contract, are payable to persons not stockholders with respect to the stock upon which such dividends are declared do not constitute dividends as to them, within the meaning of section 201 (a) of the Revenue Acts of 1918 and 1921, and are subject to taxation at both the normal and surtax rates.

*E. H. Batson, Esq.*, for the taxpayers.
*John D. Foley, Esq.*, for the Commissioner.

Before Marquette and Love.

These appeals are from the determination of deficiencies in income taxes, for the years 1916, 1919, and 1920, in the amount of $7,551.53, and an overassessment for 1921, in the amount of $418.13, as to Schneider; and for the years 1916, 1919, and 1920, in the amount of $8,300.88, and an overassessment for 1921 in the amount of $288, as to Glenn.

The two appeals involve substantially identical facts, and, by agreement of the parties, both appeals were consolidated for hearing and disposition.

The questions presented are (1) whether certain stock, received by the taxpayers under a contract, was income for 1916, or for other years, and (2) whether amounts received as dividends on the undelivered stock during the years 1916 to 1921, inclusive, constituted salary or dividends in the respective years of receipt.

### FINDINGS OF FACT.

For many years prior to March 1, 1916, both taxpayers were vice presidents of Seidenberg & Co., Inc., and of the American Cigar Co., and had been instrumental in developing the business of manufacturing and selling the Roi-Tan cigar. Seidenberg & Co., Inc., was a subsidiary of the American Cigar Co. The taxpayers planned to sever their connection with the two named companies and to engage in an independent and competing business. Sylvester, the president of the two companies, entered into negotiations with the taxpayers to induce them to remain as vice presidents of the companies in which he was interested. The negotiations resulted in contracts being executed by each of the taxpayers with Seidenberg & Co., Inc., under date of March 1, 1916, each contract being identical in terms and reading as follows:

This contract, made and entered into this first day of March, 1916, by and between Seidenberg & Company, Incorporated, a corporation organized and existing under and by virtue of the laws of the State of New Jersey, party of the first part, and Richard M. C. Glenn of New York, N. Y., party of the second part:

Witnesseth:

Whereas party of the first part is engaged in the manufacture and sale of cigars, and is a subsidiary of American Cigar Company, and party of the second part is and has been since the organization of party of the first part, actively engaged in the promotion of the business of party of the first part as an officer of said party of the first part:

And whereas said party of the second part has shown very great ability in his conduct and direction of the business of party of the first part, and party of the first part and its officers and directors, as well as officers and directors of said American Cigar Company, feel that the success and considerable achievements of party of the first part in building up a business now of large

volume and large profits, are to a great extent due to the energy, skill and ability of party of the second part, and on that account is anxious to retain unimpaired and improved the service, energy and activities of party of the second part.

And whereas party of the second part is anxious to continue to engage his efforts and services to party of the first part, but is anxious also to have a direct and continuing interest not only by way of monetary salary in the business he is helping to build, but also in the stock, and thereby the future of American Cigar Company which is the owner of all the stock of said party of the first part, and whose net profits are substantially and constantly enhanced by the profits arising from the operation of said party of the first part:

Now, therefore, in consideration of the premises and of other good and sufficient consideration moving to each of the parties hereto from the other, the receipt whereof is fully acknowledged, the parties hereto have covenanted and agreed, and do hereby covenant and agree to and with each other as follows:

First: party of the second part covenants and agrees to and with party of the first part that he will continue in its service, giving to it, as heretofore, his whole time and very best efforts in the promotion of its business at least until March 1, 1921, upon the condition, and only upon the condition that he is continued in no lower official position with party of the first part than he now enjoys, and without reduction of regular salary, and that he is continued Vice President of the American Cigar Company, with like bonus from year to year as other Vice-Presidents have; party of the second part contemplates continuing thereafter in the service of said party of the first part, but limits his absolute obligation as aforesaid, and during all the said service whether as herein contemplated or as herein expressly contracted for, party of the second part will in all ways co-operate with the other officers and directors of said party of the first part and American Cigar Company, its stockholder, to the best interest of the business, as in good conscience he is required to do, on account of the covenants and promises made by party of the first part hereinafter set out.

Second: As an inducement to the foregoing covenant by party of the second part, and in lieu of additional salary to him for said five years' service, and the service hoped for and expected by party of the first part after the termination of said five years, party of the first part hereby conditionally assigns to party of the second part an equitable ownership in fifteen hundred (1500) shares of the common stock of American Cigar Company out of three thousand (3000) shares of said stock this day equitably acquired by party of the first part. The conditions affecting this equitable assignment are as follows: Party of the second part shall be entitled to receive and enjoy all of said fifteen hundred (1500) shares, and immediately upon the receipt of dividends by the record holder of the said stock party of the first part will cause the same to be transmitted to party of the second part; On March 1, 1917, party of the first part will transfer or cause to be transferred to party of the second part one-fifth of said fifteen hundred (1500) shares, or three hundred (300) shares, and deliver the certificate therefor to party of the second part; on March 1, 1918, in like way a certificate for three hundred (300) shares additional, and so on, on the first of March of each year until certificates for the whole fifteen hundred (1500) shares are delivered, the last certificate for three hundred (300) shares being in this way deliverable on March 1, 1921. If, in the meantime, party of the second part dies or voluntarily and definitely breaches the obligation entered into by him and set out in the next preceding paragraph hereof, then the obligation to make further deliveries shall cease,

except that if such death or voluntary and definite refusal to carry out such obligation ceases at some time other than on March 1st, stock shall be delivered pro_rata upon the happening of such death or breach of obligation, counting the period by months, and accounting each day between the 1st and 15th as if it had been the 1st of that month, and each day between the 15th and last of the month as if it had been the first day of the following month, e. g. if such death or breach occurs on the 10th of August of any year before the full delivery of stock herein contemplated, then five-twelfths of the three hundred (300) shares deliverable the following March shall become deliverable; and if on the 20th of September, then seven-twelfths of such stock become and be deliverable. Deliveries of stock shall be absolute, but if, pending the full deliveries during the full five year period, by death or breach of obligation as aforesaid further deliveries are excused, there shall likewise terminate all obligation on party of the first part to make or direct further payments of dividends, and as to the stock undelivered, this equitable assignment shall be and remain, as to the undelivered stock, null and void. The obligation on party of the first part to pay or cause to be paid to party of the second part all dividends paid on the undelivered portion of the One Hundred Fifty Thousand dollars ($150,000) of stock hereby conditionally assigned, shall extend not only to ordinary dividends, but to any distribution, whether of money, property, stocks or rights that the common stockholders of American Cigar Company became entitled to, and shall apply to all stock undelivered at the time such right accrues. The right preserved to party of the first part to decline to make further deliveries upon the voluntary and definite refusal of party of the second part to carry out his obligation set forth in the next preceding paragraph hereof, is intended only as collateral security to party of the first part, and is by no means intended to permit or authorize party of the second part to disregard the obligation set out in the next preceding paragraph hereof, with only the penalty of thereby forfeiting his right to the then undelivered stock.

The taxpayers each received dividend checks regularly on the basis of ownership of 1,500 shares of stock. They signed proxies for all meetings of stockholders and their proxies were recognized at all stockholders' meetings.

The taxpayers each received certificates for 300 shares of stock on March 1, 1917, and on March 1 of each year thereafter they each received certificates for 300 shares until certificates for the full 1,500 shares were respectively received.

The taxpayers continued to serve as vice presidents of both companies during the years 1916 to 1921, inclusive, and received salaries during that period equal to the salaries paid to other vice presidents of the companies. On at least two occasions during the period the taxpayers received increases in salary.

The Commissioner treated the receipt of certificates for 300 shares of stock in each respective year as equivalent to the receipt of income for that year to the extent of the value of the stock at the time of the receipt of the certificates. He also treated the dividends received upon the undelivered stock in each year as additional salary for that year, and subjected it to both·the normal and surtax rates for each year of receipt.

The determinations of the Commissioner are approved.

OPINION.

MARQUETTE: The decision in these appeals rests upon the construction which must be given to the contracts, which are identical in terms, entered into between the respective taxpayers on the one part and Seidenberg & Co. on the other part. The taxpayers insist that, under the terms and intent thereof, they each became the owner of 1,500 shares of the capital stock of the American Cigar Co. in 1916, when the said contracts were executed, and that the value of said shares was income to them at that time. They further contend that the dividends payable and paid to them under the terms of the contracts constituted dividends as to them, as distinguished from compensation for their services. The Commissioner held that under the contracts the respective taxpayers each became the owner of 300 shares of said stock in each of the years in question which was income to them in the years of its receipt to the extent of its fair market value, and that dividends received by them on undelivered stock constituted compensation and were not dividends within the meaning of the statute.

In the construction of a contract, the primary object is to ascertain the intention of the parties as expressed therein, and the problem is not what separate parts or clauses mean but what the parties intended by the contract when considered as an entirety, for the separate parts of a contract have but little weight when compared with the contract taken as a whole. *O'Brien* v. *Miller*, 168 U. S. 287; *United States* v. *Utah, Nevada & California Stage Co.*, 199 U. S. 414. And it follows that one part of a contract may affect the construction of a different part; in other words, the general intent controls special intent. *A. Leschen & Sons Rope Co.* v. *Mayflower G. M. & R. Co.*, 173 Fed. 855; 35 L. R. A. (N. S.) 1. In the light of these rules of construction, we must ascertain what the parties intended by their agreement.

The evidence discloses that for some years prior to 1916 the taxpayers had been employed by Seidenberg & Co., a subsidiary of the American Cigar Co., and that at that time they were each vice presidents in both corporations. They determined to sever their connection with these corporations and to engage in competitive business on their own account. This intention was communicated to the president of the corporation, who was told by them that their determination would be carried out unless the corporation saw fit

to give them $150,000 each. Negotiations were carried on between the parties which culminated in the contract of March 1, 1916.

The contract provided for the services of the taxpayers for a period of five years, they to be continued in no lesser official positions, without reduction of regular salary, and with like bonuses as other vice presidents, for which they agreed to give their services and to cooperate with the officers of the corporations to the best interests of the business. The second clause of the contract gives rise to the contentions hereinabove set forth. The opening sentence thereof is as follows:

As an inducement to the foregoing covenant by party of the second part, and in lieu of additional salary to him for said five years' service * * * party of the first part hereby conditionally assigns to party of the second part an equitable ownership in fifteen hundred (1,500) shares of the common stock of American Cigar Co. * * * this to be equitably acquired by party of the first part.

The conditions of these equitable assignments were that the taxpayers were entitled to receive and enjoy all thereof and to have the dividends declared thereon. On March 1 of each year, commencing with the year 1917, there was to be transferred and delivered to each of them one-fifth of the 1,500 shares until certificates for the whole 1,500 shares were delivered, and death or a breach of the obligation entered into excused further deliveries. Deliveries of stock were to be absolute but, in case of death or breach of obligation, the right of the taxpayers to further dividends on the undelivered stock was to cease and the equitable assignment as to the undelivered stock would become null and void. The obligation of the corporation to pay dividends to the taxpayers on the undelivered stock extended to any distributions of money, property, stock, or rights pertaining to the common stock, and applied to all stock undelivered at the time the rights accrued. The clause concludes as follows:

The right preserved to party of the first part to decline to make further deliveries upon the voluntary and definite refusal of party of the second part to carry out his obligation set forth in the next preceding paragraph hereof, is intended only as collateral security to party of the first part, and is by no means intended to permit or authorize party of the second part to disregard the obligation set out in the next preceding paragraph hereof, with only the penalty of thereby forfeiting his right to the then undelivered stock.

What did the parties intend by these provisions of the contract? To us it seems clear that, in exchange for their services and their agreement to remain with the corporation for five years, they were each to receive 1,500 shares of stock of the American Cigar Co., payable one-fifth each year, and that in the meantime they were to have the beneficial ownership during that period of the undelivered stock; that is, they had the right to all dividends and other incre-

ment of the undelivered stock, provided they did not die or breach the agreement, and, as to these rights, the conditions of the contract constituted conditions subsequent, while, with relation to the delivery of the stock, they constituted conditions precedent. Performance of the agreements was the *quid pro quo* to the delivery of the absolute title to the stock, for the contract provides by its own terms that death or a breach should excuse further deliveries. The right to receive dividends or other increment of the stock is an incident of stock ownership—but is there any doubt that an owner of stock may, by agreement, separate this incident from his ownership and vest it in another without thereby making that other a stockholder? We think not; and as we view this contract that is exactly what was intended. Seidenberg & Co. had acquired an equitable interest in the stock and this equitable interest was transferred to the taxpayers with the further agreement on the part of the company to transfer to each of them the title to 300 shares each year as the agreement was performed. Until the stock was delivered to them, they had no title thereto and there was a possibility that through death or breach of agreement they would never acquire title. Nor do we think the fact that the right reserved to the company to decline to make further deliveries in case of breach was intended as collateral security changes the intent of the agreement. This clause was undoubtedly inserted for the benefit of Seidenberg & Co. and was intended to prevent the taxpayers from breaching the agreement with no penalty other than to excuse further deliveries of stock.

Upon consideration of the entire agreement, we are of opinion that the taxpayers became owners of the stock of the American Cigar Co. only as the stock was delivered to them each year, and that, as to the undelivered stock, they were not stockholders of the American Cigar Co. in respect thereof. *Appeal of Roscoe H. Aldrich*, 3 B. T. A. 911. This construction of the agreement conforms with the practical construction placed thereon by the parties themselves, for in making their returns the taxpayers returned as income in each year the shares received by them, and we think this fact is entitled to considerable weight.

Were the dividends declared on the undelivered stock dividends to the taxpayers, or did they constitute income in the nature of compensation? We have held that as to the undelivered stock the taxpayers were not stockholders of the American Cigar Co. Section 201 (a) of the Revenue Acts of 1918 and 1921 defines a dividend as " any distribution made by a corporation * * * to its shareholders or members * * * out of its earnings or profits * * *." We held in *Appeal of Roscoe H. Aldrich, supra*, that a distribution to one other than a stockholder did not constitute the distribution a dividend as to him, and that in such circumstance it was subject

to both the normal and surtax rates. That ruling is controlling here and has the further support of the agreement itself, wherein it is provided that the payments are to be "in lieu of" additional compensation. The amounts received by the taxpayers from dividends declared on undelivered stock constituted income to them subject to the normal tax and were not taxable as dividends.

The taxpayers have alleged error on the part of the Commissioner in his determination of the market value of the stock received under the contracts. No evidence was offered at the hearing bearing on the question of the fair market value of the stock in the respective years under consideration. The values thereof, as determined by the Commissioner, must stand.